Good afternoon, Your Honors. My name is Lauren Calvert. May it please the Court, I represent appellants the estate of Garrett Gardner, Robert Gardner, and Kim Gardner. I regret to inform the Court that Mrs. Gardner recently passed following a long battle with breast cancer and should this matter be remanded, we will take appropriate actions to substitute in her estate in place of her. The key issue in this case isn't a very complicated one. It's whether respondents as the moving parties in the lower court met their initial burdens of production and the ultimate burden of persuasion on their respective motions for summary judgment pursuant to Nissan Fire and Marine. To meet this burden, each of respondents was required to present admissible evidence negating an essential element of appellant's case or to show that appellants did not have sufficient evidence to carry its burden of persuasion at trial. The district court ruled plaintiffs had the ultimate burden of persuasion at trial without evaluating the moving parties' respondents here, their burden of production and persuasion on the MSJ. The party here that most clearly that hurdle was NAFCARE. They failed to cite to any particular portion of any pleading, affidavit, deposition, interrogatory answer or any other evidence. There is no citation to the record in their statement of facts and these failures alone justified a denial of their MSJ. NAFCARE conceded its rule 56 or our local rule 56-1. Counsel, could you enlighten me a bit here about the evidence on the melanoma itself? We can find scant evidence of any of the classic characteristics of melanoma. Could you tell us what evidence there is on that point? Yeah, and unfortunately, your honor, there's a lot of conflicting evidence. There were a number of experts. What about telling me what the evidence is in the light most favorable to your party? I think the two experts... I don't see your help, Mike. Well, I think I'll answer your first question first. I believe that both the coroner and our own expert, Dr. Stark, both found that Mr. Gardner had made complaints that should have alerted the medical staff to what was going on here, both in terms of the melanoma and the sepsis, necrotizing facitis. I think looking at those two reports in and of themselves give us enough to get this presented to a jury and have them make some factual findings. I think we don't even get to that question. Thank you for all that information. Now, if you'd answer my question, could you tell me what evidence there is of any of the classic symptoms of melanoma? Why don't we start with you telling me what the classic symptoms of melanoma are? I don't think we got to that point here with our expert, respectfully, your honor, because this wasn't really, I guess, what I would think of as a non-medical expert, as a classic case of melanoma. He had, you know, not kind of the skin lesions and different things that one would think of with, I guess, a quote-unquote classic case of melanoma. Well, can melanoma be expressed in different ways? And is there evidence in the record for us to review on that point? I think that's really what the experts here disputed, your honor. It doesn't help me much to have you tell me what you think. I'd like to have you tell me what the record tells us, what it shows. I would, I can pull up their expert reports and tell you, but there are literally six or seven different expert reports and they all differ on what the expression of melanoma was here. Essentially, it was internal. And one of the theories is that these lesions then were internal and then that's what allowed the sepsis and necrotizing facitis to then take hold. Thank you. And the other question I had is, what is the general pathology, or better stated, the path of melanoma in terms of its duration prior to the ultimate death of a patient? I believe that there were also differing opinions on that as well, your honor, contained within the different expert reports on what that would be. All right. What is your evidence on that point? Our expert largely pointed to statistical studies on if this had been correctly identified and treated through easy measures, that there was a very high likelihood that Mr. Gardner would either have lived at least five years or would still be alive today. Thank you. What is it that should have been apparent or even was apparent but was ignored? That it alerted the defendants to the necessity to either to provide treatment or to investigate further. I mean, there has to have been something to alert them that there was a problem to which they had some obligation to respond. So what is it that we have evidence of that they were deliberately indifferent to? So Garrett Gardner actually filed a kite saying that he was in extreme pain, that he believed he had a dislocated back. One thing that's important to note is that Mr. Gardner had a very advanced case of bipolar schizophrenia, which he was not taking medications for. Nevertheless, he still somehow was able to get a kite put out saying he was having all these severe symptoms. In response to the kite, there was something. Basically, they said, take some Tylenol, correct? That is correct, Your Honor. And the day before, they were supposed to have a regularly scheduled visit with Mr. Gardner. However, that never occurred because he didn't answer the door even though he was in a holding cell where he was supposed to be monitored every 15 to 30 minutes through a small little window. But nevertheless, the nurse did not find it alarming that he didn't answer the door to get his regularly scheduled health checkup. The only thing I'm seeing on this, it's titled Medical Dental Psychiatric Request. He says dislocated back and side with swelling and cramps and shortness of breathing. Is that what you're saying is what should have made them aware of the melanoma? Correct. So that would be what he submitted through the kite system, essentially saying he didn't feel well and wanted some medical treatment. I believe it's probably not as different here or someone who was actually taking their medication might have, you know, stated the problems, health problems that they were having. He said something about he stated he was in extreme pain. Was that in a different document? There's a couple, as I go through my notes here. The UMC records, as well as some records of NAF care, state that he had been having prolonged weakness, that he had decreased weight and fluid intake for six months, trouble walking for two weeks. And those are the records of the interview with him when he was taken to the hospital on the 21st. So right before the 10 days leading up to his death. Is that correct? That as well as some of NAF care's internal records. But I think those were probably taken as his after he had fallen ill reporting those. I'm not exactly sure that those would have been contemporaneous with the actual weight loss and difficulty walking, et cetera. Now, with respect to your suit against the police department, you've got to provide something under Monell of policy, custom or practice. You can't just show that the individuals in the prison themselves were acting deliberately indifferent, which they may or may not have been. But even assuming for the moment that the individuals in the prison were deliberately indifferent, you've got to show that with respect to that defendant, the police department, that this was pursuant to a policy or custom. What evidence do you have of that? I think we have two points on that, Your Honor. One is that pursuant to Salvi Desert Palace, if NAF care remains liable, essentially, so does LVMPD because the actions there, as in with Salvi Desert Palace qualified as attributable to LVMPD because of cooperation and interdependence, including a training course that it was being given. We believe the facts are similar here. NAF care is essentially a state actor and it is carrying out LVMPD's functions. The other is that we do have several policies and procedures that we pointed out in our motion for summary judgment, as well as our oral argument that we believe led to the deliberate indifference. And so one is that they had a policy on checking on vulnerable detainees as per the Gordon case that we cite. And the judge in the district court found that the facts here were very, very similar to Gordon and that they had not fulfilled that requirement and responsibility. It's also the kite system that they have an inadequate kite system in place. And even that the kite system they had in place was not followed. That the policy, whether officers were trained by NAF care is disputed and whether they were being trained to look for health conditions that might tell them, hey, we need to call up NAF care. There's someone here that's ill. That was completely disputed on whether that even occurred or not, let alone the adequacy. And then the ability to make medical requests through the kite system was deficient for persons that were incompetent because not taking their psychological medications. In addition, there was no infectious disease control policy per the 30B6 designee, Ms. Butler. And I see I'm at under three minutes. About three minutes. Why don't you reserve? Now let's hear from the other side. I'm not sure which one of you wants to go first, Ms. Anderson or Mr. Vogel. Good afternoon, your honors. We spoke beforehand and we're going to split our time seven minutes for NAF care, eight minutes for the police department, if that's all right with you folks. Fine, sure. Please go right ahead. Thank you. May it please the court and counsel. My name is Brent Vogel on behalf of NAF care. And in this case, the appellant's complaint alleges a constitutional violation of Mr. Gardner's right to receive adequate medical care. Specifically, what they're arguing is that NAF care had knowledge that Mr. Gardner had polymicrobial sepsis and malignant melanoma and chose not to provide care. And if you look at the EOR page 17 of their complaint, that is the specific allegation they make. They don't make allegations about there being inadequate mental health care. And the court below, Magistrate Leen, she correctly granted summary judgment for the defendants using the correct standards. She used the objective standard for deliberate indifference as the evidence produced in this case failed to, you know, it failed to demonstrate a constitutional violation of his right to receive adequate medical care. Noted that there was no evidence in the record indicating that this young man had symptoms of a bacterial infection, malignant melanoma, or any other serious medical condition before January 21st when he was found in a cell on the floor with a swollen arm and he was immediately sent out to the hospital. What obligation, if any, did your client have to do a sort of a, not mental health, but physical health screening when someone comes in? And was any screening done when he came in? There was. And there's, you know, the party stipulated into evidence the NAF care records. And in those records, there is evidence that there was an initial screening performed. He was checked for his overall medical care, his dental care, as well as his mental health care. He had been in the jail before, so they knew about the mental illness. So he was immediately hooked up with mental health services. And he was also instructed, as all inmates are, on the KITE system should you need to, if you need to access the medical care system. After that initial screening, was he discovered to be in such trouble that they then figured out he had to go to the hospital? How much time? Six months later, and it was only when he was found to have, he was unable to get up. And I think that's a good point to bring up because the evidence in this case that was considered by Magistrate Lean was that that morning, January 21st, Mr. Gardner was able to have his breakfast and have his lunch. And it wasn't until he was seen that evening when Officer O'Barr came in and saw him that you noticed, hey, he's got this swollen arm, he can't get up even. He asked him, how are you doing? He says, yeah, I'm okay. I just can't get up. And Officer O'Barr wisely, obviously determined he wasn't in good shape and contacted the NAFCA staff who immediately came, assessed him. And as soon as they saw him, they sent him out. So that was the, in response to your question, that was the first time there was evidence of, you know, a serious medical problem going on. And Ms. Calvert had brought up about a month prior, at the end of December, he had sent out the kite system. And if you look at the record, at the EOR, you can see that kite. It's at, let's see here, the page 221. And in that kite, he's not complaining of pain. He's complaining that he has dislocated backside with swelling and cramps. Now, I think you can imply that there's some pain, but he does get checked out. And the record at page 255 shows that the staff went and visited him. And there were no significant physical findings found on that date. And he was told, hey, get Motrin or Advil from the canteen. It wasn't found to be a serious medical condition based on the evidence in this case. And what's interesting also, on that date, he also expressed having suicidal ideation. So he was also seen by mental health providers, and they don't notice, they don't note any sort of physical findings on that same page 255 as well. Were there ever any physical findings suggestive of external physical manifestations of any type of cancer? I'm sorry, Judge Lucero, I didn't hear the first part of your question. Were there ever any physical manifestations of any type of cancer? No, there were not. You could actually see, I don't mean his physical condition. And no, there weren't. And what's a key piece of evidence on that point is even when he gets to the hospital at University Medical Center, they see no evidence. There's no external evidence. There's no lesions. There's no evidence that he's got some sort of, that he's got melanoma. And you would ask Mr. Kalber, what are the common signs of melanoma? The typical signs are you'll have a mole or some sort of lesion that starts acting unusually, either bleeding, spreading, growing, things along those lines. You have none of that in this case. And even the coroner found that there was no external, there was no external evidence of melanoma. It was a very unusual presentation, nothing that would have been obvious to a lay person that he had a serious medical condition going on. So when you look at the totality of everything that Magistrate Lean looked at with respect to the evidence in this case, it really was not until January 21st that we've gotten an issue that says, hey, this person, he needs some urgent medical care now. And really key on that point is he was seen on the 18th by a mental health provider. And there was no complaints of any sort of pain or swelling on that day. The next day on January 19th, he's seen by a psychiatrist because he had expressed some suicidal ideation. So they put him back in isolation. And there's no complaints to the psychiatrist on that day that he's having any sort of pain, swelling, or any sort of complications that would be consistent to what was found on the 21st. Again, again, the next day on the 20th, he's seen by a nurse. And again, there's no complaints of any sort of physical pain, inability to get up, walk around, move, eat, anything like that. In fact, they note that he is able to eat and that he is feeling generally okay. And in fact, on that date, he wanted to move back to the general population and he was. So it's interesting that there's, I think during the time he was there, excuse me, there were about 66 times he had contact with the health providers. And it wasn't until that last visit that there was any evidence that he had any sort of serious medical condition going on. Okay, thank you. We'll now hear from Ms. Anderson. Good afternoon. Getting back to Judge Lucero's point, I just wanted to give you the citation. Excuse me, but I think Lucero's question, I don't make points. Sure, Judge Lucero's question. I just wanted to give you the citation to the record, which is at the excerpts of record 411 through 421, which is his autopsy, where the coroner found that he did not exhibit any external signs of melanoma. I just wanted you to have an opportunity to see that. As the court understands, this is a deliberate indifference to serious medical needs case. It's a high standard of proof. And that treatment was denied, the treatment was delayed, that there was interference with treatment, or that there was somehow a failure to investigate a known medical condition such that, you know, you got to where you needed to go in terms of treatment. We don't have any of that in this case. At some point, he, I'm referring here to a quote, I think from a Robert, that quote, although I was only able to look at him momentarily while walking in, he was in the to Ryan and me. What date was that statement made? That statement was made at a court hearing in late December. I don't have the exact date in front of me, but I believe that it predated his kite. However, I would point out the court that the same day of that court hearing, Garrett spoke with his parents, the Affians in that affidavit on the telephone. There is no mention made at all in the phone call where Garrett is communicating to them that he is weak, or cannot care for himself or needs medical treatment or that he needs help in any way. I am asking that question in terms of causation from the date, assuming that that date is an operative date when the condition was either known or should have been known. What is the time period from that point to the point at which he is finally sent in for medical help? It would be a minimum of 25 days. I would say it's within a month's period of time between the time of that hearing and the date that he ultimately exhibited symptoms and went to the hospital. What is your argument with respect to causation on that point? With respect to causation on that point, again, I would just simply point out to the court that first of all, he was well aware of how to ask for help in the jail. There are repeated references in the record where he is talking to corrections officers, letting them know that he feels like he has suicidal intent and that he wants to see a doctor. There are referrals from the corrections officers to the medical staff. There is the kite that he submitted on the 27th, which was after that court appearance. There are no references at all in the record that at any time he said, I'm in pain. I need medical assistance. I can't get up. It's anything that would warrant further exploration. In addition to that, from the time that he was at that court hearing until the time of him being discovered in his cell, he was seen by psychologists and nurses a minimum of 20 times. He was seeing people regularly for healthcare, whether it was psychological care or just general administration of medication. There were dozens of opportunities for him if he was in fact exhibiting symptoms to say that he needed help. The only reasonable inference from that is the fact that he wasn't exhibiting those. Can I interrupt for a moment? Absolutely. One statement from an expert on his side that says it's inconceivable to him that someone who was a trained medical professional, who's seeing him during this period, would have missed that he was gravely ill. Now, whether or not it would have shown that he was gravely ill with cancer or simply gravely ill, which needed some investigation, I'm not entirely sure whether the expert is to be trusted on that point. Let me put it this way. If someone in that situation had been going to a regular doctor and the regular doctor had said, you look fine to me, go home, that's malpractice. This man was not in good condition. Now, whether that amounts to deliberate indifference under the standard is quite a different question. But what do we do with that statement by his expert who says, you know, it's inconceivable to me that anyone paying attention would have missed this? Well, it's inconceivable to me that he would make that sort of a statement because he never saw the patient. He never had an opportunity to see the patient from the time that he entered the corrections facility until the time that he became ill around the 21st of 2015. I mean, he did not see the patient. So I don't understand how he could make that statement in the first place. That being said, even, you know, the doctors that treated him at UMC said that he was surprisingly alert and in good condition given the situation that he was in once they went into the exploratory surgery. And it took the surgery to determine actually that it was cancerous. They thought they were dealing with the necritis of the tissue. Right. And importantly, a very important point is that the infectious disease doctor that, you know, provided him treatment at UMC hospital said that it really wasn't even the cancer itself that caused the symptomology that got him to the hospital. It was an infection that was caused by the cancer that began no more than 72 hours before he was admitted to the hospital. So if we're talking again about the point in time where, you know, you would see some sort of difference in his condition such that he was actually ill and needed attention. It occurred no more than 72 hours before he went into the hospital. And that's where we get into that chronology that you heard from NAFCARE's counsel where at that point in time, he's still being seen regularly by doctors and by nurses. No one, you know, no one notices anything and he does not express anything to them about needing help or treatment until the corrections officer sees him in distress and takes him to the hospital. Okay. Thank you. You've used your time. Ms. Gilbert, you've saved a little time. Sorry. I'm muting myself there. Yes, I have just a couple quick points. One is that when Officer O'Barr finds Garrett, he has this incredibly swollen arm. We've attached photos showing that. That didn't happen overnight. He's in so much pain that once he gets to the hospital, they're putting him on huge doses of fentanyl and morphine. If that doesn't show the amount of pain that he was in and the amount of distress, I believe it does. I believe that, you know, here on argument... As our brother Gorsuch used to ask when he was sitting with us in the 10th unit, let's say we spot you that, that on that day, the condition is such that it could not be ignored and it was obvious. But that's only, what, three days before or a few days before he's taken to the hospital? I think that's disputed because we have Garrett... Tell me the evidence on the dispute. It doesn't help you to just tell me it's disputed. What do you mean it's disputed? You mean it's disputed about whether he had a swollen arm? No, it's disputed that he was telling to either the correctional officers or NAVCAR employees... Assuming we agree with you that that condition on that day was so acute that no one could have missed it. No one could have misunderstood what was going on. How many days from that day expired to the point at which he went to the hospital? I trust that isn't disputed. I'm sure you must be able to answer that question. I can't, Your Honor, because we have Garrett telling UMC... Thank you then. Thank you. Thank you. I don't want to waste your time. It actually goes into one of the points I wanted to make, which is that we see he's telling UMC, he's telling other physicians, there's notes within NAVCAR's records that he'd been complaining of problems for weeks. But one of the issues we have is looking at NAVCAR's records, they are unreliable. We go into this at great length inside of our motion for summary judgment about how they're saying he's just fine. He's not having any mental breakdowns. He's taking his medications. We know he's not. He's complaining of suicidal ideation. So there are so many internal issues with NAVCAR's own records that they're unreliable. And to say that like, oh, they're doing all these health checks and he's completely fine. And then we have Garrett and his parents and other people saying, no, he was visibly not okay. And he was making complaints. That's a factual issue. And that needs to go to a jury. And I would say that NAVCAR here has made very compelling arguments. They never made any of these in their motion for summary judgment. That was our initial problem, that that alone is why the motion for summary judgment needed to be denied. They never met that initial hurdle of attaching any evidence or any medical expert report or any of the things that we're talking about here today. I know my time is over. Thank you, Your Honor. Thank all sides for their arguments in this case. Gardner v. Las Vegas Metropolitan Department et al. Now submitted for decision. Thank all counsel for their arguments.
judges: Lucero, W. Fletcher, Ikuta